Good morning your honor. I'm Tom Dominick for... Alunez has submitted, right? Yes. Okay. So we're just on Castaneda and... Well I have 15 minutes your honor or will it be 7.50? I think 7.50 is plenty, don't you? I mean, you know... I don't think we're going to be that long your honor. My name's Tom Dominick. Make it 7 then. Make it 7? Okay. Make it 6? And I want to say at the outset that I do like federal employees. So I know that came up in your first argument today. How do you feel about Delta pilots? I love Delta pilots, especially when I'm on their planes. I usually fly Southwest, so no offense to Delta. Your honor, with respect to the first argument, I just want to say that you can imagine a giant octopus sitting in Mexico. And this octopus has tentacles reaching into Idaho. And that's what they tried to bring to this jury. And it's hard when you're looking at an octopus sitting in Mexico, exactly what Mr. Castaneda did here in Idaho. And I think that was distracting to the jury and I think it was highly prejudicial. I'm just thinking of this octopus and I'm having trouble following your argument because I'm just thinking of that octopus. Exactly. I think it's shocking to a jury in Idaho to hear about the drug cartel. Basically, this came in. It came in in a March 22nd meeting involving Poncho, Francisco Chirez Aguirre, also Mr. Nunez, who also goes by the name of Canchola, and Detective Bustos. This is two months even before my client came to Idaho. He came to Idaho on May 16th. So two months before this, we have conversations about making drug deals. And basically, Detective Bustos is trying to make a price for buying drug quantities. And they negotiate a deal. And then he says, did they show any hesitancy? And by they, I mean Poncho and Canchola. Did they show any hesitancy about being able to do this? In other words, was there a supply problem? In other words, was there a cost problem? And Detective Bustos said no. And then the prosecutor asked, did Mr. Canchola participate in this conversation too? And the officer said, yes, he did. And oh, by the way, I was also advised at that time during that conversation that the Mexican government had seized a lot of money from the cartel in Mexico. And it also seized a lot of ephedrine from these people from the cartel. So that was volunteered intentionally by the officer. It wasn't pursuant to a question. Was there a motion for a mistrial? And then I moved for a motion to mistrial at the first available opportunity, which was the lunch recess, because it already got in front of the jury about this cartel. The president of Mexico is corrupt, seized ephedrine from the cartel in Mexico. And therefore, that may impact the supply. It may dry up drugs coming to Idaho. And I believe that that was an intent by the government to show, hey, they are part of this cartel. It's a conspiracy, isn't it? Isn't that the allegation? Yeah, it's a conspiracy. It's a conspiracy to import and distribute drugs. Why is it not relevant? It is relevant, right? The only question is whether it's highly prejudicial. I don't think it was relevant whatsoever. And I think that's what Judge Peckman decided. She goes, what does the seizure of ephedrine have to do with the relationship between Mr. Castaneda and Conchola? The only thing Mr. Castaneda was tied to was working with Mr. Conchola. Okay, so at this point, the judge says, okay, we've established there are dry periods because he does not have the money to keep funding the buys. But then the court just decided to move on, didn't feel it was necessary to declare a mistrial at that point, basically treated it as a de minimis non cura lux kind of a thing. Why shouldn't we do the same? I also ask that it be stricken and admonished. I think it was important because I think it was shocking to say, okay, here's a man who is very deemed to have a minimal role in the offense. He didn't even know his last name because they called him Saul Lanoue. That's how he was indicted. He allegedly made drug deals to people. The jury hung on the issue of distribution, even though three people came in and said he made deals to them. But, again, believe me, I do understand why, as an able counsel representing him, you would make the arguments that you did. But when you have a conspiracy, it kind of brings that whole ball of wax into it, doesn't it? Well, I think if it's relevant to the issue of dry periods, why there would not be methamphetamine. In Idaho, the judge called the prosecutor on that and said, is it your intent, do you intend to prove that because ephedrine was seized from the drug cartel that that impacted the supply of drugs to this conspiracy? And the prosecutor said no. My review of the record suggests that what the judge did was he felt that there was enough evidence in there about supply issues. He wasn't going to handle any more of it. He said, let's just move on. And you're going back and saying, boy, he let this one thing in here, this. He said, terminate the trial. And as you know, we really have an abuse of discretion standard here, which is a very low standard. It would give a lot of deference to the trial judges in these circumstances. Why should this reference, which admittedly probably should not have come in, why should that overturn a whole trial in this when you're talking about a conspiracy? Because I think the case was that close because of the fact that he did have a minimal role. He was only involved for this, talking a two-and-a-half-year conspiracy, he was only involved since mid-May, from mid-May to June, so that's only two months of the two-and-a-half years of the conspiracy. That's not long in a conspiracy. We get conspiracy cases that are involved in a few minutes. And we, and I understand that, but we, you know, he basically did not, mostly the time he was there, he was just present. I think it's very similar to the Negretti case where they basically said, okay, well, number one, you're doing counter-surveillance. Number two, you're driving the car. Number three, you're giving a knife to people. Number four, you know, you're also involved in other ways. But, hey, you know, you're doing, we will basically say that you're mere present. But here you've got the DEA accepted a number of calls between him and Consola where they discussed in code about various drug deals. They captured him on video involving removing a bundle from a light consistent with being a package of drugs. And there are two witnesses that testified that he brought the methamphetamine. I mean, this is just no fly-by-night conspiracy deal. They got this guy. They've got him nailed in several ways, and you pointed out some things that in the perfect world it would be great to eliminate them. But they're not enough, are they, Counsel, to overturn this trial? Judge, I think the drug cartel was brought in for exactly that reason because their evidence was so weak against my client. Otherwise, why bring it in? Why bring in anything that's going to contaminate the record? They do that all the time. You know that, don't you? And they shouldn't. Because I think it's shocking when you hear about it. We say, you know, it's harmless. And law enforcement, when they're on the stand, they volunteer a lot of stuff, don't they? That happened to me my first trial. So that doesn't shock you. But anyway, there are lots of meth labs in Idaho, aren't there? Yes. And the cartel's dealing in methamphetamine, huh? They are. Definitely they're dealing that. And I think if you're sitting on a jury here in Idaho and you're going, hey, we've got this little guy who's only here for two months, and then they're bringing in this ñ really, they're getting their drugs from the cartel in Mexico. And that was my problem with this, was if their case is so strong, why bring it in? And number two, their case is weak against my guy. Judge, you pointed out that he was deemed to have been making distributions when, in fact, the jury hung on that issue. They did not find him guilty of making distributions. John Smith, that's new to me. Oh, I apologize. Judge Smith. And he only had a minimal role in the offense. And we're talking phone calls that the first one said, Que Paso, and it was transcribed as Mr. Saul. And that's where they got the name Mr. Saul. Que Paso means what's happening. Yeah, what's happening. Actually, Que Pasa. Pasa, yeah. So we cast doubt on the credibility of the telephone calls. But I think if you're sitting on a jury in Idaho and you're hearing this stuff about the cartel, I think that's very shocking, and there's no reason to bring it in. They shouldn't have. In Vallejo, they wouldn't even allow any evidence of an organization, but I quoted the language from Vallejo because I could not find any cases where people are talking about the drug cartel. I researched this several times, and apparently it's not done very often and at least hasn't been ruled on by the courts. But I think because it is so rare and because it is so shocking that, in this case, I think it did impact the jury, and I think it's impossible giving. No cautionary instruction was given. I asked for striking and for a caution, and it wasn't even given that, even though I think Judge Peckman, who is the trial judge, Judge Lodge, who was the sentencing judge, even though Judge Peckman felt it was not relevant. He said, what's this got to do with anything? So we have, number one, not relevant. The only issue is prejudice, and I agree it was prejudice because if I shock you in talking about an octopus, imagine talking about a drug cartel if you're from Idaho and, hey, they're the ones that are providing drugs to these people. It didn't shock me. He just won't be able to sleep for a week. In the old days, I've got some old, I forget the name of the magazine, but they were very common back in the 1840s and all that. They'd show Atlantic Monthly. They'd show sailing ships crossing the Atlantic, and they'd show these huge octopuses. They had their tentacles all around it, and they got a sailor up there. When I was five years old, that made an impression on me. But if you saw that octopus and you thought it was going to come and invade your state, wouldn't you be worried about that? That would help you. I'd probably set up a cafe that specializes in octopi. I can see I'm out of time. Any additional questions? As far as mere presence, I don't know. Thank you for your testimony. May it please the Court, Counsel. The only octopus analogy I can make in this case is that defense's attempt to squirt ink into the water. Do you need to make a rebuttal? Yes, sir. Do you? What's that, sir? Do you need to make a rebuttal? I'd like to because I've been excited to talk to you about this case. I don't want to deny you. And if I could just have a couple of minutes, that would be sufficient. Did you make this octopus argument? No, sir. In fact, the truth of the matter is that the defense star witness made the octopus in this case. The reason this case cannot be overturned is because, number one, the only case cited by counsel is Vallejo. Vallejo was not a conspiracy case, so it's distinguished there. Secondly, it wasn't expert testimony by the officer. It was the defendant's star witness who used the terms Mexican cartel and who talked about ephedrine and talked about seizures. It was Mr. Canchola, who was the co-defendant of this defendant, Mr. Castaneda, who the officer was testifying about a conversation he had with Mr. Canchola, their star witness, in which Mr. Canchola raised the issue of Mexican cartels and ephedrine and seizures and all of those things. It was the officer only describing what his co-conspirator said during and in furtherance of a conspiracy. It wasn't even about the Canchola-Castaneda conspiracy. It was about Mr. Canchola's view about what's happening generally in Mexico. He wasn't even describing his own organization. He simply was talking about this is what's going on with supply. These cartels are doing this. There's been seizures. We're having trouble. And it was in the context of that that it came up. When it was finally brought to the court's attention, the court said, don't go there anymore, and we didn't. Now, if you take that evidence, and really the only thing we're talking about is a reference to a Mexican cartel, if you take that and compare that to all the other evidence in the case, this defendant was hanging at the stash house at the very hub of the organization's He was there with the only other member of the conspiracy, Mr. Canchola. The government had nothing to do with this cartel business. The government did not elicit the person who said Mexican cartel was the co-defendant of the defendant. Who brought up this octopus story? It didn't come up during the trial, Your Honor. You mean the cartel business?  Okay. That was the opposing counsel that brought it up. That was the opposing counsel brought it up today. Oh, I see. It didn't come up during the trial. Mr. Canchola, in an effort to gain the business of the undercover officer, talked about the sources of supply. And it was the same conversation they talked. They could bring three, four pounds. They could get all the officer wanted. And ultimately, Judge Smith, you're correct in that the evidence was quite overwhelming. We had video of him taking out brake lights. We had conversations of him talking about let's do a movement. And finally, the last day the defendant was in the stash house, the next morning when they did the search warrants, there's pounds of drugs everywhere. There's MSM everywhere. There's drugs in plain view. There's drug ledgers. There's guns sticking out of furniture. There are cutting agents. All of those things were there. The evidence is quite overwhelming. There's nothing in the record to suggest why the jury decided against the distribution count. It's not in the record. But it is clear that they weighed the evidence carefully and found there's conspiracy. It was a de minimis thing that referenced to the ‑‑ and even if it had been elicited by the government from the undercover agent as expert testimony, it's still a de minimis thing. But when you consider that the defense made Mr. Canciola their star witness from the very first sentence of opening statement and it was Mr. Canciola who said these things, it makes it even more clear the court didn't abuse its discretion. And on the mere presence issue, Your Honors, it was simply unnecessary because the court did have no basis. It was unnecessary because there were two witnesses that testified they got drugs directly from Mr. Castaneda. And Mr. Castaneda told another witness that he was selling drugs with Mr. Canciola. So the government ran a good, clean trial. Yes, sir. Why don't you sit down. Thank you. He's four minutes over, too. Yeah, I know. I just want to clear up, Your Honor, that ‑‑ You're the octopus. I brought it up today. I was trying to make the point of ‑‑ I mean, you city slickers, you know, got to watch you now. Okay. Well, I thought it was a good analogy, but you may disagree with that. You know, Detective Bustos for the government brought up this comment, and it was unsolicited. And basically he said, did Mr. Canciola participate in this conversation? And Mr. Bustos said, yes, he did. And then we get the comment, and by the way, he also said that ‑‑ Canciola also said during this conversation that this cartel had basically lost a bunch of money and ephedrine to the corrupt Mexican government. And then they talked about the ephedrine seizure. And then they talked about a couple other things, like how the corrupt Mexican president was apparently impacting things. But then when Judge Peckman said, what is this relevant to? Basically he said, well, dry periods. And Judge Peckman said, well, Detective Bustos already testified that he didn't have unlimited number of buy funds. He could only buy a certain amount of drugs. So that limited the amount of money or the drugs that the government could buy. Second of all, he said that this was not, you know, do you intend to prove this? Do you intend to prove that because ephedrine was seized from the Mexican drug cartel that this somehow impacted the flow of methamphetamine to Idaho? And Proskier said no. I think we've got all of this. Okay. Well, I do want to say just I wanted to bring back how that came up. It was not Mr. Canciola bringing it up at trial. It was Mr. Bustos, Detective Bustos for the government. And I want to say it wasn't ‑‑ It reminds me I forgot to bring one of my pills today. Oh. I'm not going to ask you why. Because I'm talking about octopus. But I think it wasn't de minimis because we had a trial. It was hotly contested. We contested many of the issues. A jury was hung on the issue. They deliberated three days on the conspiracy issue. There's no reason to bring it in. The only reason they brought it in was to try to shock the jury, to make them think that the cartel is supplying drugs to these people. And that impacted the ability of the jury to look at what Mr. ‑‑ You know, we've got a public forum outside. You can stand on the stairs. We've got all this. We've got all this. All right. Thank you. We love you. Okay. Anything else? All right. Jesus.
judges: Pregerson, Noonan, Smith M.